## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**DARRYL COLE**                                    **CIVIL ACTION**

**VERSUS**                                          **NO. 21-1348**

**OCEANEERING INTERNATIONAL, INC.**      **SECTION: D (5)**

### ORDER AND REASONS

Before the Court is a Motion for Partial Summary Judgment, filed by Oceaneering International, Inc. ("Oceaneering").[1] Oceaneering asserts that it is entitled to summary judgment and dismissal of Darryl Cole's Jones Act claims because Cole was neither a direct employee nor a borrowed servant of Oceaneering. Cole opposes the Motion.[2]

Also before the Court is Plaintiff's Motion for Partial Summary Judgment on Borrowed Servant Status.[3] Oceaneering opposes that Motion, adopting the arguments it made and the evidence it submitted in support of its Motion for Partial Summary Judgment,[4] and Cole has filed a Reply.[5]

After careful consideration of the parties' memoranda and the applicable law, Oceaneering's Motion for Partial Summary Judgment is **DENIED** and Cole's Motion for Partial Summary Judgment on Borrowed Servant  Status is **GRANTED.**

---

[1] R. Doc. 55.
[2] R. Doc. 60.
[3] R. Doc. 70.
[4] R. Doc. 87 (*citing* R. Doc. 55).
[5] R. Doc. 98.

## I.     FACTUAL AND PROCEDURAL BACKGROUND[6]

This matter arises out of a claim for personal injuries allegedly sustained by Darryl Cole while he was working aboard the M/V OCEAN PATRIOT, an offshore diving and support vessel owned and operated by Oceaneering.  Cole asserts that at the time of his injuries, Huisman North America Services LLC ("Huisman") was his direct employer and Oceaneering was his Jones Act employer based upon the borrowed servant doctrine.[7]

### A.  Oceaneering's Motion for Partial Summary Judgment

Oceaneering seeks summary judgment and dismissal of Cole's Jones Act claims on the basis that Cole was neither a Jones Act seaman nor a borrowed employee of Oceaneering.[8]  Oceaneering asserts that the Fifth Circuit in *Ruiz v. Shell* set forth nine factors for courts to consider in determining whether an employee is a borrowed servant, and that the undisputed facts show that a majority of the factors weigh against the existence of a borrowed employment relationship in this case.[9]  While conceding that Cole satisfies three of the nine factors, Oceaneering argues that the six remaining factors, including the most important factor – who has control over the employee and the work he is performing – weigh against a borrowed employment relationship.[10]  Oceaneering claims that it did not control or direct Cole's work aboard

---

[6] The Court set forth the facts and procedural history of this case in great detail in its March 31, 2023 Order and Reasons (R. Doc. 189) and, for the sake of brevity, they will not be repeated here.

[7] R. Doc. 19 at ¶¶ 2, 3, & 7.

[8] R. Doc. 55-1 at p. 2.  Oceaneering notes that it raised the issue of Cole's status as a seaman in a separate motion for summary judgment.  *Id*. at n.15 (*citing* R. Doc. 45).

[9] R. Doc. 55-1 at pp. 4-5.

[10] *Id*. at pp. 4-8.

the M/V OCEAN PATRIOT, and that Huisman supervised Cole's work. [11] Oceaneering asserts that it is entitled to summary judgment because the undisputed facts, as applied to *Ruiz,* show that Cole remained exclusively an employee of Huisman at all times.[12]

Cole opposes the Motion, arguing that all nine of the *Ruiz* factors weigh in favor of borrowed servant status.[13]  Cole asserts that he was a member of the crew of the M/V OCEAN PATRIOT and was under the complete and total control of Oceaneering while working aboard the vessel.[14]  Cole points out that Huisman had no other employees on the M/V OCEAN PATRIOT who could have controlled his work, and further asserts that the undisputed testimony from Huisman's corporate representative, Robert Thompson, shows that Huisman exercised no control over Cole's work aboard the M/V OCEAN PATRIOT. [15]  As such, Cole asserts that Oceaneering's Motion should be denied.

### B. Cole's Motion for Partial Summary Judgment on Borrowed Servant Status

In his own Motion, Cole argues that all nine of the *Ruiz* factors weigh in favor of borrowed servant status, including the most important factor – control.[16]  Cole essentially makes the same arguments and relies upon the same evidence submitted in support of his Opposition to Oceaneering's Motion.[17]  Oceaneering opposes the

---

[11] R. Doc. 55-1 at pp. 5-6.
[12] *Id*. at p. 9.
[13] R. Doc. 60 at p. 1.
[14] *Id*.
[15] *Id*. at pp. 3-7 (*citing* R. Doc. R. Doc. 60-9).
[16] R. Doc. 70.
[17] *See, generally,* R. Docs. 70 through 70-17.

Motion, but "submits that its Motion (Rec. Doc. 55) (attached hereto as Exhibit 'A') should serve as an Opposition to Plaintiff's cross-motion on those very same issues (Rec. Doc. 70)."[18]   Oceaneering asserts that, "As the prior briefing by Oceaneering makes clear, Plaintiff was neither a direct employee nor a borrowed servant of Oceaneering at any given time.  Accordingly, his claims against Oceaneering under the Jones Act must be dismissed as a matter of law."[19]   Oceaneering further asserts that it "will submit additional briefing on the issue of Plaintiff's borrowed servant status should the Court so desire."[20]   In response, Cole asserts that because Oceaneering failed to rebut his Statement of Uncontested Facts with contradictory evidence, all of the factual allegations contained therein should be deemed admitted for the purpose of his Motion.[21]   Cole then reviews each of Oceaneering's deficient responses and admissions and argues that they support his contention that all nine of the *Ruiz* factors weigh in favor of borrowed servant status in this case.[22]

## II.   LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate where there is no genuine disputed issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[23]   A party moving for summary judgment must inform the Court of the basis for

---

[18] R. Doc. 87 at p. 1.
[19] *Id*.
[20] *Id*.
[21] R. Doc. 98 at p. 1.
[22] *Id*. at pp. 1-7.
[23] Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986).

the motion and identify those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, that show that there is no such genuine issue of material fact.[24]  If the moving party carries its burden of proof under Rule 56, the opposing party must direct the Court's attention to specific evidence in the record which demonstrates that the non-moving party can satisfy a reasonable jury that it is entitled to a verdict in its favor.[25]  This burden is not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence.[26]  Rather, Rule 56 mandates that summary judgment be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.[27]  In resolving a motion for summary judgment, the Court must review the facts and inferences in the light most favorable to the non-moving party, and the Court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes.[28]

## III.   ANALYSIS

### A. Borrowed Servant Status

The Fifth Circuit has held that, "in the absence of substantial evidence to the contrary . . . the issue of whether a relationship of borrowed servant exist[s] is a

---

[24] *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.
[25] *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.
[26] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[27] *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552.
[28] *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

matter of law."[29]  The Fifth Circuit in *Ruiz v. Shell Oil Co.* developed a nine-factor test to determine whether borrowed servant status exists.[30]  Pursuant to *Ruiz*, courts consider the following nine factors in making that determination:

1. Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
2. Whose work is being performed?
3. Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer?
4. Did the employee acquiesce in the new work situation?
5. Did the original employer terminate his relationship with the employee?
6. Who furnished tools and place for performance?
7. Was the new employment over a considerable length of time?
8. Who had the right to discharge the employee?
9. Who had the obligation to pay the employee?[31]

The Fifth Circuit has made clear that, "Although no single one of these factors is decisive, the first is the most critical."[32]  Additionally, "[t]he central question in borrowed servant cases is whether someone has the power to control and direct another person in the performance of his work."[33]  The Fifth Circuit has long noted that, "a careful distinction must be made between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking."[34]  Further, a borrowing employer "gives direct orders to its borrowed servant."[35]

---

[29] *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 314 (5th Cir. 1969) (citing authority).

[30] *Id.* at 312-314.

[31] *Mays v. Director, Office of Workers' Compensation Programs*, 938 F.3d 637, 641-42 (5th Cir. 2019) (quoting *Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir. 1977) (citing *Ruiz*, 413 F.2d at 312-13)) (internal quotation marks omitted).

[32] *Mays*, 938 F.3d at 642 (citing *Hall v. Diamond M Co.*, 732 F.2d 1246, 1249 (5th Cir. 1984)).

[33] *Mays*, 938 F.3d at 642 (quoting *Hebron v. Union Oil Co. of Cal.*, 634 F.2d 245, 247 (5th Cir. 1981)) (internal quotation marks omitted).

[34] *Mays*, 938 F.3d at 643-44 (quoting *Ruiz*, 413 F.2d at 313) (internal quotation marks omitted).

[35] *Mays*, 938 F.3d at 644 (citing authority).

1. _Who has control over the employee and the work he is performing, beyond_
   _mere suggestion of details or cooperation?_

The first _Ruiz_ factor asks who has control over the employee and the work he is performing.  The evidence shows that while Cole was responsible for operating the crane on the M/V OCEAN PATRIOT,[36] authoritative direction and control over the work was exercised by Oceaneering, not Huisman.  Robert Thompson, Huisman's corporate representative, testified that when a client, like Oceaneering, requests a crane operator to arrive at a certain location, Huisman instructs the crane operator, like Cole, where to report for work.[37]  Thompson testified that once an employee is deployed to Oceaneering and on the boat "he's theirs until otherwise," meaning that the employee "is theirs at that point."[38]  When asked whether Huisman provides instructions to its crane operators regarding how to lift things, Thompson testified, "No."[39]  Thompson explained that:

> [O]nce they're on location - - and using this example - - Oceaneering, someone on the boat will say, that goes over there, this goes in the water, this goes into there.  There's usually always a deck foreman or, you know, a rigging crew or, you know, the ABs.  All vessels are different. They all operate different.  When the operator is on board, he melds into the crew and he becomes part of whatever they want or however they instruct him to do it.
>
> Now, he has the right, as any person offshore, to stop the job and do that.  And as part of his thing, he's to ensure that the lift is safe. . . .

---

[36] R. Doc. 55-2 at p. 16, ll. 19-22; R. Doc. 55-2 at p. 17, ll. 10-13; R. Doc. 70-7 at p. 9, ll. 19-22.
[37] R. Doc. 55-2 at p. 9.
[38] R. Doc. 70-7 at pp. 6-7.
[39] R. Doc. 70-1 at p. 7.  _See, Id._ at p. 8.

> So, especially when assets of Subsea, or whatever, the crane operator is purely a puppet at that point.[40]

Thompson further testified that:

> When they are offshore and they're working with assets, generally there is a lift plan from the moment that project ever started and everything that's going on. . . . There's a plan to how everything is going to move, where it's going to move, when it's going to move. The crane operator can't arbitrarily decide that, I just like going over to the port side every day, so I'm going to pick this up and go over the port side. Either the projects team, OBG and Oceaneering would be - - say, pick this up and you go over the port side over there. Or, no, we want this to go over starboard side. He's following their commands to deliver them.
> Now, they don't sit up there and tell him, okay, just a little more pressure on the stick. A little more pressure. That's part of being a skilled crane operator. He knows how to move the sticks to produce what he's being told to do on the deck.[41]

When asked who provides Cole with his day-to-day instructions, Thompson testified that, "I tell him to get on that boat. Once he's on that boat, he's - - where to be on that boat comes from the boat."[42] Thompson also testified that Cole was responsible for operating a crane "And any other duty as requested" by Oceaneering.[43] Thompson further explained that, "We send him out there, he's to be part of the crew and do anything the crew asks, within reason. . . . He is to meld in and function as part of the crew, replacing their own operator."[44] Thompson elaborated that:

> [T]here are two Oceaneering crane operators that are directly employed by Oceaneering. There is a rental operator by me. Those crane operators are part of the crew. He's part of the crew. Once they step on board that gangway, they are to be part of whatever the - - I think by

---

[40] R. Doc. 70-7 at pp. 8-9.
[41] *Id*. at pp. 10-11.
[42] *Id*. at pp. 17-18.
[43] *Id*. at p. 18.
[44] *Id*. at p. 21.

> maritime law, at that point, the captain has jurisdiction over everything.
> And at that point, he's to do what he's told within his capabilities.[45]

Cole likewise testified during his deposition that his immediate boss on the M/V OCEAN PATRIOT was the captain, and that the caption directed him to do his job.[46] Cole further asserts in his affidavit that he worked 12-hour shifts aboard the M/V OCEAN PATRIOT during which he was either "operating the crane or doing whatever else we were told to do by the captain, chief mate, chief engineer, or dive crew that was within our capabilities."[47]

Oceaneering does not address or otherwise dispute this evidence in its summary judgment briefing.[48]  Instead, Oceaneering first advises that it did not control or direct Cole's work aboard the M/V OCEAN PATRIOT because Huisman decided which of its employees would be sent offshore.[49]  The Court finds this fact irrelevant to the first factor, which asks who exercised control over Cole and the work he performed while aboard the M/V OCEAN PATRIOT.  To be clear, the fact that an employer selected a particular individual to perform work on a vessel, or even whether a particular individual was requested by the vessel operator, does not address who had control over that individual's work once he was present on the vessel.  Oceaneering also asserts that Huisman "remained in control over Plaintiff's qualifications to perform the tasks at hand,"[50] but cites no legal authority indicating

---

[45] *Id*. at pp. 22-23.
[46] R. Doc. 70-10 at p. 6.
[47] R. Doc. 70-5 at ¶ 11.
[48] *See*, R. Docs. 55-1 & 87.
[49] R. Doc. 55-1 at p. 5.
[50] *Id*. at p. 6.

the relevance of Cole's qualifications to the issue of control once he was assigned to a vessel.  Oceaneering further asserts that although Huisman had no physical presence aboard the M/V OCEAN PATRIOT, it retained active supervision over Cole's activities because Cole was required to, and did, report to his supervisors at Huisman at the end of each day.[51]  Oceaneering points out that Thompson, Huisman's corporate representative, testified that its employees are required to submit a "Daily Report" to its headquarters detailing the employees' actions and undertakings while aboard their assigned vessels, and confirmed that Cole was complying with the requirement in February 2021.[52]

Oceaneering, however, ignores Thompson's testimony that if crane operators have an issue when they are on the job, they should report it to the vessel.[53]  Oceaneering also ignores Thompson's testimony regarding the purpose of the "Daily Reports," which Huisman uses "for invoicing back up," noting that, "It's just a convenience to us."[54]  Thompson further testified that Huisman's employees are instructed to send the reports "daily," but that, for various reasons, they may come weekly.[55]  Thompson testified that if Huisman has not received a report from an employee in a while, "We don't actively pursue it.  It's just a - - it's a convenience for us at this point."[56]  Thompson also testified that Cole provided daily reports via e-mail to Huisman, but when asked whether Cole submitted them daily, Thompson

---

[51] *Id.*
[52] *Id.* (*citing* R. Doc. 55-2 at pp. 4 & 17).
[53] R. Doc. 55-2 at p. 3.
[54] *Id.* at p. 4.
[55] *Id.* at p. 5.
[56] *Id.*

responded, "I don't believe he did.  I think he was doing them more on an every four or five days [sic], just batching them in."[57]  Cole submitted copies of the two "daily report" summaries that he emailed to Huisman on February 14, 2021 and February 20, 2021, which summarize his activities each day during those two weeks.[58]  There is no evidence before the Court, however, indicating that Huisman ever replied to Cole's emails, or provided any direction, instruction, supervision, or control of Cole's duties while aboard the M/V OCEAN PATRIOT.

The Court finds that the foregoing, undisputed evidence, establishes that Oceaneering, not Huisman, exercised control over Cole's work when he was aboard the M/V OCEAN PATRIOT.  As such, this factor weighs in favor of borrowed servant status.

### 2.  *Whose work is being performed?*

Oceaneering concedes that the work performed by Cole while aboard the M/V OCEAN PATRIOT was necessary for Oceaneering's operations.[59]  Cole agrees.[60]  As such, the Court finds that this factor weighs in favor of borrowed servant status.

### 3.  *Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer?*

The third *Ruiz* factor requires the Court to consider whether there was an agreement, understanding, or meeting of the minds between the original and the borrowing employer.[61]  Oceaneering asserts that the pertinent terms and conditions

---

[57] R. Doc. 70-7 at p. 14.
[58] R. Doc. 60-8 at pp. 1-4.
[59] R. Doc. 55-1 at pp. 4-5; R. Doc. 87 (*citing* R. Doc. 55).
[60] R. Doc.  60 at p. 9; R. Doc. 70-2 at p. 10.
[61] *Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir. 1977).

governing the agreement (Purchase Order) between Oceaneering and Huisman provide that Huisman and, by extension, its employees, was to remain an independent contractor at all times and would not act as an employee or agent of Oceaneering.[62]  Oceaneering argues that the language of the agreement is clear and unambiguous, and that another Section of this Court has held that such language weighs against a finding of borrowed servant status.[63]  Without disputing the applicability of the purchase order terms to this issue, Cole asserts that while the language in the Purchase Order provides that Huisman will be an independent contractor and not an employee of Oceaneering, it does not mention Huisman's employees being independent contractors.[64]  Cole claims that the purchase order terms and condition also do not mention Huisman maintaining supervision, direction, and/or control over its employees while aboard the M/V OCEAN PATRIOT.[65]  As such, Cole argues that this case is distinguishable from other cases where courts have concluded that similar contract provisions weigh against borrowed servant status.[66]  Cole claims that the only record evidence regarding the understanding between Huisman and Oceaneering is Thompson's testimony, and that he made clear that once aboard the M/V OCEAN PATRIOT, Cole was under the complete supervision and control of Oceaneering.[67]

---

[62] R. Doc. 55-1 at p. 7 (*citing* R. Doc. 55-6).

[63] R. Doc. 55-1 at p. 7 (citing *Skipper v. A&M Dockside Repair, Inc.*, 430 F. Supp. 3d 170, 180 (E.D. La. 2020)).

[64] R. Doc. 60 at p. 9; R. Doc. 70-2 at p. 11.

[65] R. Doc. 60 at p. 9; R. Doc. 70-2 at p. 11.

[66] R. Doc. 60 at pp. 9-10 (citing *Foret v. James Marine Hahnville, LLC*, 455 F. Supp. 3d 261, 270 (E.D. La. 2020)); R. Doc. 70-2 at p. 11 (citing *Foret, supra*).

[67] R. Doc. 60 at pp. 9-10 (footnote omitted); R. Doc. 70-2 at p. 11.

In support of its Motion, Oceaneering submitted a copy of a Purchase Order dated February 9, 2021 that appears to be for the services of Darryl Cole as a crane operator, which lists Mark Bergeron from Oceaneering as the buyer and Huisman as the supplier.[68]  Oceaneering also provided a copy of the "Purchase Order Terms and Conditions," which provide that, "Seller shall act as an independent contractor and not as an agent or employee of Buyer or its customer."[69]  As Cole correctly points out, the terms of the Purchase Order do not reference Huisman's employees or their status while working for Oceaneering.  Thus, the facts of this case are distinguishable from those in *Skipper v. A&M Dockside Repair, Inc.*, cited by Oceaneering.[70]  In *Skipper,* another Section of this Court found that the agreement between the direct employer and the owner of the barge upon which the plaintiff was injured weighed against borrowed servant status because it specified that the direct employer's employees, including the plaintiff, "shall at all times be deemed an independent contractor."[71] The Purchase Order in this case contains no such language regarding the status of Huisman's employees, including Cole, while working for Oceaneering.  Additionally, the *Skipper* court recognized that, "courts have found borrowed servant status notwithstanding the existence of such a clause."[72]

---

[68] R. Doc. 55-6 at pp. 1, 2, 3, & 4.

[69] *Id*. at p. 6.

[70] 430 F. Supp. 3d 170 (E.D. La. 2020).

[71] *Id*. at 180.

[72] *Id*.  The Court notes that on appeal, the Fifth Circuit likewise recognized that, "we have previously upheld the application of the borrowed servant defense despite this type of clause."  *Skipper v. A&M Dockside Repair, Inc.*, 829 Fed.Appx. 1, 5 (5th Cir. 2020), *cert denied*, 141 S.Ct. 2569 (2021) (citing *Gaudet v. Exxon Corp.*, 562 F.2d 351, 358 (5th Cir. 1977).

The Court likewise finds the facts of this case distinguishable from those in *Foret v. James Marine Hahnville, LLC*, where another Section of this Court found that the agreement weighed against borrowed servant status because it specified that the direct employer "shall have and maintain complete control, direction, and responsibility over its own employees and subcontractors, and over the work."[73]  The Purchase Order in this case does not mention Huisman maintaining control over Cole while aboard the M/V OCEAN PATRIOT.

Because there is no clear evidence before the Court regarding the understanding between Huisman and Oceaneering, the Court finds that this factor is neutral.

### 4.  *Did the employee acquiesce in the new work situation?*

The fourth *Ruiz* factor asks whether the employee acquiesced in the new work situation.  Oceaneering asserts that Cole had only been working aboard the M/V OCEAN PATRIOT for two weeks when he allegedly fell ill, and that although Cole was aware of his assignment, any objection on his part would have likely resulted in his termination.[74]  As such, Oceaneering concludes that, "it can hardly be said that Plaintiff acquiesced to a new work environment over such a short period of time."[75]  Oceaneering claims that, "At the very least, this factor is neutral – it does not support a finding of borrowed employment."[76]  Oceaneering cites no evidence or legal authority to support these assertions.

---

[73] 455 F. Supp. 3d 261, 270 (E.D. La. 2020).
[74] R. Doc. 55-1 at p. 7.
[75] *Id.*
[76] *Id.* at p. 8.

As Cole correctly points out, the focus of this factor is whether the employee was aware of his work conditions and chose to continue working in them.[77] The evidence before the Court shows that Cole was aware of his assignment to Oceaneering and chose to continue working on the M/V OCEAN PATRIOT, as he was on his second hitch aboard the vessel at the time he allegedly fell ill.[78] While the Court does not believe that Oceaneering intended to mislead the Court by asserting that Cole had only been working aboard the M/V OCEAN PATRIOT for two weeks when he fell ill,[79] Oceaneering's assertion ignores the fact that Cole had previously worked aboard the M/V OCEAN PATRIOT from December 11, 2020 to January 14, 2021.[80] The fact that Cole worked aboard the M/V OCEAN PATRIOT for a total of 48 days between December 11, 2020 and February 21, 2021 indicates that Cole agreed to the new work assignment. Moreover, the Fifth Circuit has held that one month is a sufficient amount of time for an employee to appreciate his new work conditions.[81] Cole's affidavit, which Oceaneering does not dispute or contest, further shows that Cole complied with his role as a crane operator aboard the M/V OCEAN PATRIOT and never objected to his new assignment.[82] The Court therefore finds that this factor weighs in favor of borrowed servant status.

---

[77] R. Doc. 60 at p. 19 (quoting *In re Weeks Marine, Inc.*, 88 F. Supp. 3d 593, 599 (M.D. La. 2015) (quoting *Brown v. Union Oil of Calif.*, 984 F.2d 674, 678 (5th Cir. 1993))) (internal quotation marks omitted); R. Doc. 70-2 at p. 11 (quoting *In re Weeks Marine, Inc.*, *supra*).
[78] R. Doc. 55-4; *See,* R. Doc. 60-7.
[79] R. Doc. 55-1 at p. 7.
[80] R. Doc. 55-4.
[81] *Brown*, 984 F.2d at 678.
[82] R. Doc. 60-11 at ¶ 13; R. Doc. 70-5 at ¶ 13.

5. _Did the original employer terminate its relationship with the employee?_

The fifth _Ruiz_ factor asks whether the original employer terminated his relationship with the employee.  According to the Fifth Circuit, "The emphasis when considering this factor should focus on the lending employer's relationship with the employee while the borrowing occurs."[83]  Oceaneering argues that this factor weighs against borrowed servant status because Huisman did not terminate its relationship with Cole while he worked for Oceaneering, as Cole maintained regular contact with Huisman in the form of submitting daily reports.[84]  Cole maintains that he did not have daily contact with Huisman, and that he merely updated Huisman of his activities every week or so and did not receive any instruction, supervision, or response of any type from Huisman.[85]  Cole claims that in _Foret v. James Marine Hahnville, LLC_, another Section of this Court held that minimal interactions with the direct employer coupled with the borrowing employer supervising the employee's work weighed in favor of borrowed servant status.[86]

The evidence shows that when Cole worked aboard the M/V OCEAN PATRIOT, Huisman's control over Cole was nominal, at best.  There is no evidence indicating that Huisman maintained "regular contact" with Cole.  Instead, the evidence shows that Cole emailed Huisman twice, on February 14, 2021 and February 20, 2021, informing Huisman of the activities he performed each day during

---

[83] _Brown_, 984 F.2d at 678 (quoting _Melancon v. Amoco Production Co._, 834 F.2d 1238, 1246 (5th Cir. 1988)) (internal quotation marks omitted).
[84] R. Doc. 55-1 at p. 8.
[85] R. Doc. 60 at p. 11; R. Doc. 70-2 at p. 12.
[86] R. Doc. 60 at p. 11 (citing _Foret_, 455 F. Supp. 3d 261, 271 (E.D. La. 2020)); R. Doc. 70-2 at p. 12 (citing _Foret, supra_).

the prior week.[87]  There is no evidence before the Court indicating that Huisman ever responded to Cole or otherwise monitored or controlled his work when he was aboard the M/V OCEAN PATRIOT.   Nonetheless, Thompson testified that Huisman employees are instructed to email Huisman daily reports of their actions and what they have been instructed to do while aboard a vessel.[88]  Viewing this factor in the light most favorable to the non-moving party, Oceaneering, as the Court has in evaluating each of the factors, the Court finds that this factor is neutral.

### 6. *Who furnished the tools and place for performance?*

Oceaneering concedes that it furnished the tools and place of performance necessary for Cole to complete his work as a crane operator aboard the M/V OCEAN PATRIOT.[89]  Cole agrees.[90]  As such, this factor weighs in favor of borrowed servant status.

### 7. *Was the new employment over a considerable length of time?*

The seventh *Ruiz* factor asks whether the new employment was over a considerable length of time.  Oceaneering asserts that this factor weighs against borrowed servant status because Cole had only been working aboard the M/V OCEAN PATRIOT for two weeks when he fell ill, and had only worked aboard Oceaneering vessels on one occasion before that.[91]  Oceaneering argues that, "Such a limited duration is insufficient to establish a transition to a borrowed servant relationship."[92]

---

[87] R. Doc. 60-8 at pp. 1-4.
[88] R. Doc. 55-2 at pp. 3-5.
[89] R. Doc. 55-1 at pp. 4-5; R. Doc. 87 (*citing* R. Doc. 55).
[90] R. Doc. 60 at p. 11; R. Doc. 70-2 at pp. 12-13.
[91] R. Doc. 55-1 at p. 8 (*citing* R. Doc. 55-4).
[92] R. Doc. 55-1 at p. 8.

Oceaneering cites no legal authority to support its position.  Cole asserts that he was on his second hitch when he fell ill, that he had been working continuously for Oceaneering for over three months at the time, and that he was scheduled for two additional hitches after the hitch during which he fell ill.[93]  Cole argues that this amounts to "over 100 days offshore (assuming his last two hitches were also 28-day hitches) over eight months," which weighs in favor of borrowed servant status.[94]  Cole cites two cases to support his position, one in which the court concluded that three months weighed slightly in favor of borrowed servant status where the employee was under the control of the borrowed employer,[95] and another where the court concluded that six months was a significant length of time.[96]

While not addressed by the parties, when it comes to what constitutes a considerable length of time under *Ruiz*, the Fifth Circuit has recognized that, "scattershot findings abound."[97]  The Fifth Circuit has found that a one-month period[98] and a 90-day period were neutral.[99]  In another case, the Fifth Circuit noted that "it is debatable whether approximately a year and a half is a 'considerable' length of time," but concluded that the district court was correct in finding that the evidence weighed in favor of borrowed servant status.[100]  The Fifth Circuit has also found that

---

[93] R. Doc. 60 at p. 11 (*citing* R. Doc. 60-7; R. Doc. 55-4); R. Doc. 70-2 at p. 13 (*citing* R. Doc. 70-17; R. Doc. 70-7 at pp. 5-6; R. Doc. 55-4).

[94] R. Doc. 60 at p. 11; R. Doc. 70-2 at p. 13.

[95] R. Doc. 60 at p. 11 (citing *Garner v. Pontchartrain Partners, LLC*, Civ. A. No. 20-1179, 2022 WL 2116897, at *4 (E.D. La. June 13, 2022) (Lemmon, J.)); R. Doc. 70-2 at p. 13 (citing *Garner*, *supra*).

[96] R. Doc. 60 at p. 11 (citing *Williams v. Arco Oil & Gas, Inc.*, Civ. A. No. 89-5201, 1990 WL 178722, at *2 (E.D. La. May 16, 1990) (Feldman, J.)); R. Doc. 70-2 at p. 13 (citing *Williams*, *supra*).

[97] *Mays v. Dir., Off. Of Workers' Comp. Programs*, 938 F.3d 637, 646 (5th Cir. 2019).

[98] *Brown v. Union Oil Co. of Calif.*, 984 F.2d 674, 679 (5th Cir. 1993).

[99] *Mays*, 938 F.3d at 646.

[100] *U.S. Fire Ins. Co. v. Miller*, 381 F.3d 385, 390 (5th Cir. 2004).

seven years was a considerable length of time under *Ruiz*.[101]  Here, the evidence shows that Cole spent 48 days aboard the M/V OCEAN PATRIOT between December 11, 2020 and February 21, 2021.  While Thompson testified that Oceaneering had requested Cole for two additional hitches in April and July of 2021,[102] Cole did not work the additional hitches due to his injuries on February 21, 2021.  The Court is not persuaded that it should include the length of any potential future hitches in Cole's employment period with Oceaneering, as Cole did not actually work for Oceaneering during that time.

Based on the foregoing Fifth Circuit authority, the Court finds it questionable whether 48 days, or about a month and a half, constitutes a considerable amount of time for purposes of *Ruiz*.  As with its analysis of all of the factors, viewing this factor in the light most favorable to Oceaneering, the non-mover, the Court finds that this factor is neutral.

### 8. *Who had the right to discharge the employee?*

Oceaneering concedes that it could remove Cole from the M/V OCEAN PATRIOT if necessary.[103]  Cole agrees.[104]  As such, the Court finds that this factor weighs in favor of borrowed servant status.

### 9. *Who had the obligation to pay the employee?*

The ninth and final *Ruiz* factor asks who had the obligation to pay the employee.  Oceaneering asserts that this factor weighs against borrowed servant

---

[101] *Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1246 (5th Cir. 1988).
[102] R. Doc. 70-7 at p. 6.
[103] R. Doc. 55-1 at pp. 4-5; R. Doc. 87 (*citing* R. Doc. 55).
[104] R. Doc. 60 at p. 12; R. Doc. 70-2 at p. 13.

status because Thompson testified that Huisman was the only entity responsible for paying Cole.[105]  Relying upon the affidavit of James Ray Barker, the Senior Human Resources Business Partner for Oceaneering, Oceaneering asserts that it was neither obligated to pay, nor did it ever actually pay, Cole's wages.[106]  Cole asserts that pursuant to the terms of Oceaneering's Purchase Order, Oceaneering was responsible for paying Cole's time aboard the vessel, his travel time, his travel expenses, and per diem.[107]  Cole argues that Oceaneering was indirectly paying for Cole's time and that this arrangement weighs in favor of borrowed servant status.[108]

The Fifth Circuit has held that, "When the funds used to pay the employee are received from the entity the employee is contracted out to, we have held that entity, in effect, pays the employee."[109]  Other Sections of this Court have reached the same conclusion.[110]  While the Court is unable to locate the provision of the Purchase Order

---

[105] R. Doc. 55-1 at p. 8 (*citing* R. Doc. 55-2 at pp. 6 & 7).

[106] R. Doc. 55-1 at pp. 8-9 (*citing* R. Doc. 55-3 at p. 1).

[107] R. Doc. 60 at p. 12 (*citing* R. Doc. 55-10); R. Doc. 70-2 at p. 14 (*citing* R. Doc. 70-8).

[108] R. Doc. 60 at p. 12 (citing *Skipper v. A&M Dockside Repair, Inc.*, 829 Fed.Appx. 1, 6 (5th Cir. 2020); *Foret v. James Marine Hahnville, LLC*, 455 F. Supp. 3d 261, 272 (E.D. La. 2020)); R. Doc. 70-2 at p. 14 (citing *Skipper*, *supra*; *Foret*, *supra*).

[109] *Skipper*, 829 Fed.Appx. at 6 (citing *Capps v. N.L. Baroid-NL Industries, Inc.*, 784 F.2d 615, 618 (5th Cir. 1986)).  *See*, *Melancon v. Amoco Production Co.*, 834 F.2d 1238, 1246 (5th Cir. 1988) (citing *Capps*, 784 F.2d at 618) ("Finally, we agree the district court was correct in finding that Amoco paid Melancon's wages via Beraud based on the number of hours Melancon worked for Amoco.  The fact that Beraud kept a percentage of the amount Amoco was charged in not relevant.  Amoco furnished the funds from which Beraud paid Melancon, and this is the determinative inquiry for this factor.").  *See also*, *Champagne v. Penrod Drilling Co.*, 341 F. Supp. 1282, 1285 (W.D. La. 1971) ("In essence, the wages of Mr. LeBlanc and his co-workers were paid by Penrod, even though they received their checks from Terrebonne.").

[110] *Garner v. Pontchartrain Partners, LLC*, Civ. A. No. 20-1179, 2022 WL 2116897, at *4 (E.D. La. June 13, 2022) (citing authority) ("Zealous CEO/President Kenneth Leblanc averred that Zealous paid Captain Morgan $450 per day from the funds received from Pontchartrain Partners. . . . Thus, Pontchartrain Partners ultimately paid for Captain Morgan's services.  This arrangement supports a finding of borrowed employee status."); *Foret*, 455 F. Supp. 3d at 272 ("Here, although Hutco issued Dillon's paycheck, James Marine tracked Dillon's hours and paid Hutco for Dillon's work.  The Court therefore finds this factor weighs in favor of borrowed servant status.").

that purportedly requires Oceaneering to pay Cole's wages,[111] Cole has submitted an "Order Confirmation" issued by Huisman that reflects an order date of February 9, 2021, and includes the price owed by Oceaneering for the "Days," "Travel Days," "Per Diem," and "Estimated Travel Costs" of a crane operator for "Crane Operations Feb-March 2021," for a total of $39,228.00.[112] That amount matches the total on the Purchase Order submitted by both parties.[113] Oceaneering, however, has submitted evidence that it was never obligated to pay, nor did it ever actually pay, Cole's wages. Because there is conflicting evidence before the Court, and because neither party has addressed the evidence submitted by the opposing party, the Court finds that this factor is neutral.

In sum, the Court finds that five of the nine *Ruiz* factors weigh in favor of a borrowed servant status, while the remaining four factors are neutral. None of the factors weigh against a finding of borrowed servant status. Notably, the first factor–control–heavily favors finding a borrowed servant relationship. Accordingly, the Court finds that Darryl Cole was Oceaneering's borrowed servant and that Cole is entitled to summary judgment on this issue.

## IV.  CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Oceaneering's Motion for Partial Summary Judgment[114] is **DENIED.**

---

[111] R. Doc. 55-6; R. Doc. 70-8 at pp. 1-4.
[112] R. Doc. 70-8 at pp. 5-7.
[113] *See*, R. Doc. 55-6 & R. Doc. 70-8 at pp. 1-4.
[114] R. Doc. 55.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment on Borrowed Servant Status[115] is **GRANTED.**

New Orleans, Louisiana, July 11, 2023.

**WENDY B. VITTER**
**United States District Judge**

---

[115] R. Doc. 70.